**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

UNITED STATES OF AMERICA,           )
                                    )
                    Plaintiff,      )      Case No.: 2:13-cr-00018-JCM-GWF
                                    )
vs.                                 )      **ORDER**
                                    )
LEON BENZER, et al.,                )
                                    )
                    Defendants.     )
_____)

     This matter is before the Court on Defendant Keith Gregory's Motion to Change Venue (#383), filed on October 30, 2014. Defendant Edith Gillespie filed a Motion for Joinder to Gregory's Motion for Change of Venue (#385) on October 31, 2014. The Government filed its Response (#404) on November 16, 2014. Defendant Gregory filed his Reply (#416) on November 21, 2014. Also before the Court is Defendant Leon Benzer's Motion for Transfer of Trial to the Unofficial Northern Division of the District Court of Nevada (#391), filed on November 3, 2014. The Government filed its Response (#409) on November 20, 2014. Defendant Benzer filed his Reply (#419) on November 25, 2014. The Court conducted a hearing in this matter on December 15, 2014.

## DISCUSSION

     The indictment in this case charges the Defendants with conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1349; wire fraud in violation of 18 U.S.C. § 1343; and mail fraud in violation of 18 U.S.C. § 1341. *Indictment (#1)*. The indictment alleges that Defendant Leon Benzer, the owner of Silver Lining Construction Company (SLC), together with an experienced construction defects attorney, now deceased, were the masterminds of a conspiracy

whose object was to take control of the boards of directors of various condominium homeowners associations ("HOAs") through the election of board members controlled by the conspirators. The controlled board members would then vote to award legal, construction defect and other work for the associations to entities controlled by the conspirators, including SLC. Although not named in the indictment, the alleged co-mastermind of the conspiracy has elsewhere been identified as Nancy Quon.

The indictment alleges that Defendant Keith Gregory, an attorney, "did work for Benzer and SLC, and who through the actions of SLC controlled boards, was hired and acted as general counsel at the Vistana and Sunset Cliffs HOAs and who, at the direction of SLC and Benzer, purported to represent an SLC and Benzer controlled board candidate in an action against an HOA board that SLC and Benzer were attempting to control." *Indictment (#1)*, ¶ 13. The remaining co-defendants charged in the indictment include a private investigator who was allegedly a straw buyer and SLC controlled board member at the Chateau Nouveau HOA; an attorney who allegedly did work for SLC and Benzer, acted as general counsel at the Park Avenue and Pebble Creek HOAs, and at the direction of SLC and Benzer purported to represent an HOA in an effort to secure board positions for SLC and Benzer controlled candidates; an individual who allegedly was a straw buyer and SLC controlled board member at the Park Avenue and Chateau Nouveau HOAs; a real estate agent who allegedly was a straw buyer and SLC controlled board member at the Chateau Nouveau HOA; and Defendant Benzer's half-sister, who allegedly was a straw buyer at an HOA, and who allegedly recruited other straw buyers and board candidates on behalf of Mr. Benzer. Numerous other individuals have been separately charged in indictments relating to the alleged conspiracy and have plead guilty pursuant to plea agreements with the Government. Some, if not many, of these individuals may be called to testify at trial as witnesses for the Government.

This case has received extensive news media coverage, primarily in the *Las Vegas Review-Journal* newspaper, since the law enforcement investigation into the alleged conspiracy was publicly revealed in September 2008. Defendant Benzer has attached to his motion approximately 137 *Review-Journal* articles that have been published since September 2008. By the Court's calculation, 12 articles were published in the last four months of 2008, one article was published in

November 2009, one article was published in May 2010, 22 articles were published in 2011, 39 articles were published in 2012, 33 articles were published in 2013 and 29 articles were published in 2014. *Defendant Benzer's Motion (#391), Exhibit E.* Defendant Gregory has also attached many of these same articles as exhibits to his motion. Most of the exhibits are print-outs of articles that appeared in the *Las Vegas Review-Journal's* internet website edition.[1] Defendants have attached copies of a few articles that were published in the newspaper's print edition.

According to the Government, "167,000 people receive the Las Vegas Review-Journal in hard copy." *Government's Response (#409), pgs. 7-8,* citing LAS VEGAS Review-Journal, Work for the Las Vegas Review-Journal, http://www.Review-Journal.com/work (last visited Nov. 7, 2014). The Government states that it was unable to find information on the number of visitors to the *Review-Journal's* website. *Id. pg. 8, n. 2.* The Government notes that in 2014 the population of Clark County, Nevada exceeded 2 million. *Government's Response (#409), pg 7*, citing a Las Vegas Sun newspaper on-line article dated March 27, 2014. Defendant Gregory responds that the jury pool in the unofficial Southern Division of the District of Nevada is drawn from registered voters. According to the Nevada Secretary of State's website, the number of registered voters in Clark County and other counties in the unofficial Southern Division in late 2014 was 1,027,102.

Defendant Gregory cites a 2013 Gallup poll which indicated that for every one person who obtains news information from print newspapers, 2.5 persons obtain their news information from internet sources. *Defendant Gregory's Reply (#416), pg. 5, n. 14*, citing http://www.gallup.com/poll/163412/americans-main-source-news.aspx (last accessed on November 19, 2014). From this data, Defendant Gregory extrapolates that 400,000 individuals view the *Las Vegas Review-Journal*'s website. The *Las Vegas Review-Journal*, and to a lesser extent the *Las Vegas Sun*, are the principal online sources for Southern Nevada local news and it is reasonable to believe that the number of people who access the *Review-Journal's* website is not negligible. Whether that number equals or exceeds the number of subscribers to the newspaper's print edition

---

[1] Defendant Gregory's exhibits appear to be copies of articles printed from the *Review-Journal's* website. Defendant Benzer's exhibits were obtained from NewsBank, Inc., an online service that collects and distributes newspaper articles, and other news media reports.

1   is unknown.  It is, however, speculation to assert that 2.5 times as many people read the *Review-*
2   *Journal* online as read its print edition.

3          There has been relatively little coverage of this case in other print media or on-line
4   newspapers, magazines or other publications.  Defendant Benzer has attached copies of fourteen
5   (14) articles from print or online sources other than the *Review-Journal* that have been published
6   since December 2011, with the most recent article appearing in January 2013.  Defendant Gregory
7   has attached to his reply a recent editorial in the *Las Vegas Tribune* newspaper which attacks Mr.
8   Benzer.  *Reply (#416), Exhibit D.*  No information has been provided regarding the *Las Vegas*
9   *Tribune's* circulation.  It is the Court's understanding that this publication does not have wide
10  circulation.

11         The Court is familiar with *Las Vegas Review-Journal's* website.  Generally, the home or
12  main page of the website displays a larger font-size headline for the lead article, followed by
13  smaller headlines for additional articles below the main headline.  A photograph generally
14  accompanies each headline.  A brief summary of the articles appears below each headline.  A
15  reader opens a news article by clicking on the headline.  Readers can also access different sections
16  of the newspaper by clicking on titles such as News, Politics, A&E, Life, Trending, Opinion,
17  Travel, Sports, and Obits (obituaries).  *See* http://www.reviewjournal.com.  Because Defendants
18  have attached only copies of the online articles, one cannot determine where or how prominently
19  these articles were displayed on the newspaper's website.  There is no information regarding the
20  number of individuals who accessed any particular article.  Readers are also able to post comments
21  which are displayed below the article.  Most of the commentators are anonymous or use
22  pseudonyms.  Defendant Gregory has pointed out various comments which display the
23  commentators' prejudice against Defendants in extreme or inflammatory language.  *See Gregory*
24  *Motion(#383), Exhibits FF-XX.*[2]

25         Between September 25, 2008 and November 15, 2008, the *Review-Journal* published
26  approximately 13 articles that discussed information obtained by the reporters from various sources

27  _____

28          [2] The comments appear on articles published since March 2013.

4

concerning the investigation.  Mr. Benzer and Ms. Quon were mentioned in these news reports as possible targets of the investigation.  The articles also discussed the suicide of a police officer who was reportedly a subject of the investigation.  *Defendant Benzer's Motion for Transfer (#391), Exhibit E.*  During the period from September 24, 2008 to November 22, 2008 there were also reports about the investigation on the local television news programs.  These reports appeared primarily on KLAS-CBS, Channel 8, which included reports by the station's investigative unit known as the "I-team."  These reports also identified Mr. Benzer and attorney Nancy Quon as prime suspects in the investigation.  *Id., Exhibit B.*

Between the end of October 2008 and early 2011, there was relatively little news coverage about the investigation in the *Las Vegas Review-Journal.*  The newspaper published an article by columnist John L. Smith on November 15, 2009 regarding a police department lieutenant who was an alleged central figure in the investigation and which also made reference to Mr. Benzer, Ms. Quon and other individuals identified as suspects in the alleged conspiracy.  *Defendant Benzer's Motion (#391), Exhibit E.*  Another column by John L. Smith was published on May 12, 2010 which again discussed the police lieutenant and made reference to Mr. Benzer and Ms. Quon. Defendant Gregory has also attached to his motion a December 7, 2010 column by John L. Smith, regarding reports of a rumor that Ms. Quon had attempted suicide, and a December 10, 2010 article by reporter Jeff German concerning the transfer of the federal investigation to the Department of Justice's Fraud and Public Integrity section.  *Defendant Gregory's Motion (#383), Exhibits D and E.*  Television news reports about the homeowners association fraud investigation were made by KLAS-CBS on February 19-20, 2009, March 18, 2009, and July 13-14, 2009.  *Defendant Benzer's Motion (#391), Exhibit B, pgs. 31-32.*

KLAS-CBS and other local television stations issued reports between November 2010 and January 2012 regarding an alleged plot by Nancy Quon's boyfriend to obtain narcotics to either murder Ms. Quon or to assist her in committing suicide.  Some of these news reports made reference to Ms. Quon's alleged involvement in the homeowners association fraud investigation. *Defendant Benzer's Motion (#391), Exhibit B, pgs. 16-30.*  In March 2011, *Las Vegas Review-Journal* also published a column by John L. Smith regarding an alleged murder-suicide plot by Ms.

5

Quon and her boyfriend.  *Defendant Gregory's Motion (#383), Exhibit G.*  Defendants have not included other  newspaper articles relating to Ms. Quon's alleged suicide plot as exhibits to their motions.

In March 2011, a *Las Vegas Review-Journal* article discussed a government investigation into a possible leak of information by someone in the United States Attorney's Office regarding the homeowners association fraud investigation.  *Defendant Gregory's Motion (#383), Exhibit F.*  In March 2011, the newspaper reported that the homeowners association fraud investigation had broadened to include 75 to 100 alleged conspirators, including judges, attorneys and police officers. (No judges have been accused or charged in the scheme).  *Id., Exhibit H.*  An editorial was published in the *Review-Journal* on March 9, 2011, regarding the alleged conspiracy and commented on abusive and frivolous litigation arising out construction defect claims, and called for reform of the civil justice system.  *Id., Exhibit I.*  Defendant Benzer has also attached January 12, 2011 and April 25, 2011 newspaper articles about a contractual dispute between Mr. Benzer and attorney David Amesbury over the Courthouse Café coffee shop which they jointly owned.  The articles noted that Mr. Benzer and Mr. Amesbury had been linked to the FBI's ongoing homeowners association fraud investigation.  *Defendant Benzer's Motion (#391), Exhibit E.*

On September 1, 2011, the *Las Vegas Review-Journal* reported on the indictment and plea agreement of Steve Wark, the first individual to enter a guilty plea in regard to the alleged conspiracy.  *Defendant Gregory's Motion (#383), Exhibit J.*  The article recounted the factual allegations regarding Wark's involvement in the conspiracy as set forth in the indictment against him and in his plea agreement.  The article also referenced a civil lawsuit in state court which described a close relationship between Wark and Leon Benzer and Silver Lining Construction Company.  The *Review-Journal* subsequently reported on other  individuals who entered guilty pleas in regard to the alleged conspiracy.  These articles also recounted criminal conduct that the defendants admitted to as part of their plea agreements.  *See e.g. Defendant Gregory's Motion (#383), Exhibits L, M,* and *N.*  Among the individuals who plead guilty, the newspaper reported on the guilty plea of attorney David Amesbury.  *Defendant Benzer's Motion (#391), Exhibit E, Review-Journal* articles, dated October 25 and 30, 2011.  The newspaper subsequently reported on

6

November 17-18, 2011 that Mr. Amesbury was found badly beaten in a gated community. *Id.* On March 20, 2012, the *Review-Journal* reported that Nancy Quon had been found dead. *Defendant Gregory's Motion (#383), Exhibit S.* (Later media reports stated that the coroner determined that Ms. Quon committed suicide.) A week later on March 27, 2012, the newspaper reported the David Amesbury was found dead by apparent hanging at his brother's property in northern California. *Defendant Benzer's Motion (#391), Exhibit E.* These events also generated considerable coverage on television news stations between March 20 and 30, 2012. *Defendant Benzer's Motion (#391), Exhibit B,*

The *Las Vegas Review-Journal* has continued to report regularly on this case as it has proceeded forward, including articles regarding numerous defendants who have entered guilty pleas, the analysis of evidence or factual information that has been disclosed through indictments, plea agreements, court motions, interviews with homeowners, and information from related civil actions. It is not possible for the Court to summarize each of the newspaper articles that have been published. In general, the principal reporter has provided factual detail and, as the Government states, has described the factual information in the articles with terms and phrases such as "the government alleges," or "the document states." Many of the articles refer to Defendant Benzer as the alleged mastermind of the scheme and often repeat a summary of the basic outlines of the case. The *Review-Journal* has been critical of the government, defense counsel and the court regarding the filing of various documents under seal and the secrecy that allegedly surrounds this case. The newspaper has also commented on the delay caused by continuances of the trial due to the extensive discovery that has been produced.

The most serious incident relating to potential prejudicial pretrial publicity occurred on October 30, 2014 when the *Las Vegas Review-Journal* printed a front-page article in its print edition, as well as in its online edition, that reported on the contents of written reports of proffer sessions between Defendant Benzer and the Government. These reports were filed by Defendant Gregory in support of his motion for severance and were unsealed and publically accessible for a period of two days in early September 2014. *See Defendant Gregory's Reply (#416), Exhibit A.* The newspaper article does not set forth the content of the reports in extended detail, but does cite

portions of the reports which are damaging to Defendant Benzer, as well as to Defendant Gregory. The most damaging aspect of these proffer sessions was also recounted by Defendant Gregory in his Motion for Severance (#328).

According to the Gallup poll cited by Defendant Gregory, 55% of Americans state that they obtain news about current events from television. *See* TV Is Americans' Main Source of News, http://www.gallup.com/poll/163412/americans-main-source-news.aspx. Defendant Benzer has attached to his motion a synopsis of local television news coverage of this case and the underlying investigation. *Defendant Benzer's Motion (#391), Exhibit B.* There are four Southern Nevada television stations with daily local news programs that broadcast in the English language: KLAS-CBS (Channel 8), KSNV-NBC (Channel 3), KTNV-ABC (Channel 13), and KVVU-Fox (Channel 5). There is also a local television station that broadcasts in the Spanish language: KINC-UNIVISION. The great majority of the television news coverage of this case has been by KLAS-CBS (Channel 8). According to Exhibit B, in 2014 KLAS-CBS reported on this case a total of five (5) times through July 29, 2014. No other television news station reported on the case in 2014. There were a total of twenty-one (21) television reports on 10 days during 2013. Of these, fifteen (15) reports were on KLAS-CBS (Channel 8), four (4) reports were on KSNV-NBC (Channel 3), and two (2) reports were on KINC-UNIVISION. KTNV-ABC (Channel 13) and KVVU-Fox (Channel 5) have not reported on this case during the past 2 years. KTNV-ABC (Channel 13) last reported on the case in June, 2012 and it appears that KVVU-Fox (Channel 5) last reported on May 27, 2011. The synopsis of the television news reports relating to this case indicate that they have generally been brief and factual in nature.

In addition to the news media coverage of this case, Defendants also cite as grounds for a change of venue, the fact that a substantial portion of Clark County, Nevada residents reside in communities governed by homeowners associations. Defendants argue that they will not be able to obtain a fair and impartial trial in Las Vegas because the residents of these communities have been prejudiced by the news coverage and may also be biased against the Defendants because the alleged crimes involve efforts to defraud homeowners associations and the residents who reside in such communities. As evidence of this prejudice, Defendants cite some of the online comments to

*Review-Journal* articles. Defendant Benzer requests that this case be transferred to the unofficial Northern Division of this district for trial in Reno, Nevada. Defendant Benzer notes that there has been no coverage about this case in the Reno or Northern Nevada news media. *Defendant Benzer's Motion (#391), Exhibit D.* Defendants also point out that a significantly lower percentage of the population in the Reno-Carson City area reside in communities governed by homeowners associations.

### DISCUSSION

Rule 18 of the Federal Rules of Criminal Procedure states that "[u]nless a statute or these rules permit otherwise, the government must prosecute an offense in the district where the offense was committed. The court must set the place of trial within the district with due regard for the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice." Rule 21(a) provides that "[u]pon the defendant's motion, the court must transfer the proceeding against the defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."

Defendant Benzer argues that his request for an intra-district transfer of this case to Reno, Nevada permits the Court to apply a more lenient standard for transfer than that imposed under Rule 21. Defendant Benzer notes that Rule 18 was amended in 1966 to eliminate the requirement that a prosecution be in the division of the district in which the offense was committed and "vests discretion in the court to fix the place of trial at any place within the district with due regard to the convenience of the defendant and his witnesses." Advisory Committee Notes, 1966 Amendments. The Advisory Committee Notes further stated:

> The former requirement for venue within the division operated in an irrational fashion. Divisions have been created in only half of the districts, and the differentiation between those districts with and without divisions often bears no relationship to the comparative size or population. In many districts a single judge is required to sit in several divisions and only brief and infrequent terms may be held in particular divisions. As a consequence under the original rule there was often undue delay in the disposition of criminal cases–delay which was particularly serious with respect to defendants who had been unable to secure release on bail pending the holding of the next term of court.

> If the court is satisfied that there exists in the place fixed for trial
> prejudice against the defendant so great as to render the trial unfair,
> the court may, of course, fix another place of trial within the district
> (if there be such) where such prejudice does not exist. Cf. Rule 21
> dealing with transfers between districts.

Rule 18, Advisory Committee Notes, 1966 Amendments.

Defendant also cites *United States v. Clark*, 416 F.2d 63, 64 (9th Cir. 1969) in which the district court set defendant's second trial in Helena, Montana which was 90 miles away from Great Falls where his first trial had been conducted. The court rejected defendant's objection that this was an impermissible change in venue, stating: "It was not a change of venue but a change among court-created divisions of the District of Montana. We find neither abuse of discretion nor prejudice. Fed.R.Crim.P. 18."

It would certainly make some sense to transfer this case to Reno if prejudicial pretrial publicity makes a fair trial in Las Vegas impossible. Because Reno and Las Vegas are within the same judicial district, it would likely be easier to schedule and coordinate the use of a courtroom and court facilities in Reno than transfer to another district might entail. Transfer to Reno also would not necessarily result in a change of judge. Defendant Benzer also argues that alleged victims or other members of the public who desire to attend the trial can be accommodated by a video-feed between Reno and Las Vegas. The Court does not believe, however, that Rule 18 provides a more lenient standard for intra-district transfer based on prejudice against the defendant. First, the comments to the 1966 Amendments to Rule 18 expressly references the standard in Rule 21(a) for transferring trial of a case due to prejudice in the place fixed for trial. Second, such a distinction could lead to odd and contradictory results. The State and District of Nevada encompasses a large geographical area. Reno is 346 straight line miles from Las Vegas, and the driving distance between the two cities is 450 miles. This distance is substantially greater than the distances between major metropolitan areas in different states and federal districts in other parts of the country.[3] The distance between Reno and Las Vegas is also significantly greater than is the

---

[3] Philadelphia and New York City, and Washington, D.C. and Philadelphia, for example, are much closer to each other geographically than are Las Vegas and Reno.

distance between Las Vegas and the Central District of California (Los Angeles) or the District of Arizona (Phoenix). It does not make reasonable sense that a lower standard for transfer based on prejudice should apply to an intra-district transfer, particularly where it results in a trial in a place substantially more distant than would occur if trial was transferred to another federal district.

In *Skilling v. United States*, 561 U.S. 258, 130 S.Ct. 2896 (2010), the Supreme Court set forth the standards governing a defendant's motion for change of venue because of presumed prejudice in the place fixed for trial. The Court noted that the Sixth Amendment secures to criminal defendants the right to trial by an impartial jury. The Court stated that "[b]y constitutional design, that trial occurs 'in the State where the . . . Crimes . . . have been committed.' Art. III, § 2, cl. 3. See also Amdt. 6 (right to trial by 'jury of the State and district wherein the crime shall have been committed')." 130 S.Ct. at 2912-13. The Court stated that these prescriptions "do not impede transfer of the proceeding to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial—a 'basic requirement of due process[.]" *Id.* at 2913, citing *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623 (1955). The Court further stated that transfer decisions by district courts pursuant to Rule 21 "are granted a healthy measure of appellate court respect." *Skilling,* 130 S.Ct. at 2913 n. 11. The Court noted that federal courts have invoked the rule to transfer certain highly charged cases such as *United States v. McVeigh*, 918 F.Supp. 1467, 1474 (W.D.Okla. 1996), which involved the bombing of the federal courthouse in Oklahoma City, versus decisions in which courts have exercised their discretion to deny transfer in cases "involving substantial pretrial publicity and community impact," such as cases involving the 1993 World Trade Center bombing. *Id.*

*Skilling* stated that the foundational precedent for the transfer of venue due to presumed prejudice is *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417 (1963). In *Rideau*, a man robbed a bank, kidnapped three of the employees and killed one of them. The defendant was apprehended a few hours after the crime. The next morning the defendant was subjected to a filmed "interview" in the jail by the sheriff which lasted approximately 20 minutes and consisted of interrogation by the sheriff and admissions by the defendant Rideau that he had perpetrated the crimes. Later that day, the interview was broadcast over a local television station and was seen by some 24,000

people.  The interview was shown on television the next day to an estimated audience of 53,000 people.  The interview was again broadcast on the third day on the same television station and was observed by approximately 20,000 people.  The Court noted that the Louisiana parish in which the crime occurred had a population of approximately 150,000 people.  *Id.* 373 U.S. at 724, 83 S.Ct. at 1418.  The state trial court denied defendant's motion for transfer of venue and he was convicted of the charged crimes.  In holding that the defendant could not have received a fair and impartial trial in the community in which the television broadcasts occurred, the Supreme Court stated:

> ". . .[W]e hold that it was a denial of due process of law to refuse the request for a change of venue, after the people of Calcasieu Parish had been exposed repeatedly and in depth to the spectacle of Rideau personally confessing in detail to the crimes with which he was later charged.  For anyone who has ever watched television the conclusion cannot be avoided that this spectacle, to the tens of thousands of people who saw and heard it, in a very real sense *was* Rideau's trial–at which he pleaded guilty to murder.  Any subsequent court proceeding in a community so pervasively exposed to such a spectacle could be but a hollow formality.

*Rideau*, 373 U.S. at 726, 83 S.Ct. at 1419.  *See also Skilling,* 130 S.Ct. at 2914.

The Court noted in *Skilling* that it followed *Rideau* in *Estes v. Texas*, 381 U.S. 532, 538, 85 S.Ct. 1628 (1965) and *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507 (1966).  The Court stated that in *Estes*, "extensive publicity before trial swelled into excessive exposure during preliminary court proceedings as reporters and television crews overran the courtroom and 'bombard[ed] . . . the community with the sights and sounds of' the pretrial hearing.  The media's overzealous reporting efforts, we observed, 'led to considerable disruption' and denied the 'judicial serenity and calm to which [Billie Sol Estes] was entitled.' *Id.,* at 536, 85 S.Ct. 1628." 130 S.Ct. at 2914.  In *Sheppard*, "news reporters extensively covered the story of Sam Sheppard, who was accused of bludgeoning his pregnant wife to death.  '[B]edlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom,' thrusting jurors 'into the role of celebrities.' *Id*, at 353, 355, 86 S.Ct. 1507.  Pretrial media coverage, which we characterized as months [of] virulent publicity about Sheppard and the murder,' did not alone deny due process, we noted. *Id.,* at 354, 86 S.Ct. 1507.  But Sheppard's case involved more than heated reporting pretrial: We upset the murder conviction because a carnival atmosphere' pervaded the trial, *id.,* at 258, 86 S.Ct.

1507." *Skilling*, 130 S.Ct. at 2914.

In placing *Estes* and *Sheppard* in context, the Court stated:

> In each of these cases, we overturned a "conviction obtained in a trial atmosphere that [was] utterly corrupted by press coverage"; our decisions, however, "cannot be made to stand for the proposition that juror exposure to ... news accounts of the crime ... alone presumptively deprives the defendant of due process." *Murphy v. Florida,* 421 U.S. 794, 798–799, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). See also, *e.g., Patton v. Yount,* 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). Prominence does not necessarily produce prejudice, and juror *impartiality,* we have reiterated, does not require *ignorance. Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (Jurors are not required to be "totally ignorant of the facts and issues involved"; "scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case."); *Reynolds v. United States,* 98 U.S. 145, 155–156, 25 L.Ed. 244 (1879) ("[E]very case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits."). A presumption of prejudice, our decisions indicate, attends only the extreme case.

*Skilling*, 130 S.Ct. at 2914.

The Court considered four factors derived from *Rideau*, *Estes* and *Sheppard* in determining whether the defendant had been subjected to such adverse pretrial publicity that prejudice should be presumed. First, the Court considered the size and characteristics of the community in which the alleged crime occurred. The Court noted that in *Rideau* the crime occurred in a community of only 150,000 residents, whereas in *Skilling* the trial occurred in Houston, Texas which had a potential juror pool of more than 4.5 million individuals. The Court stated that "[g]iven this large, diverse pool of potential jurors, the suggestion that 12 impartial individuals could not be empaneled is hard to sustain." *Id.*, 130 S.Ct. at 2915. The Court also cited *Mu'Min v. Virginia*, 500 U.S. 415, 429, 111 S.Ct. 1899 (1991) (potential for prejudice mitigated by the size of Washington D.C., which had a population of over 3 million); and *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044, 111 S.Ct. 2720 (1991) (plurality opinion) ("reduced likelihood of prejudice where venire was drawn from a pool of over 600,000 individuals"). *Id.* at 2915.

Second, the Court in *Skilling* stated that although news stories about the defendant had not been kind, they contained no confession or blatantly prejudicial information of the type readers or

viewers could not reasonably be expected to shut from sight.  The Court contrasted this with "Rideau's dramatically staged admission of guilt [which] was likely imprinted indelibly in the mind of anyone who watched it."  *Id.*, at 2916.  The Court noted that the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him and which jurors may have difficulty in disbelieving or forgetting.  *Id.*  Third, the Court considered the level of media coverage in the period close to trial.  The Court stated that "unlike cases in which trial swiftly followed a widely reported crime, *e.g., Rideau*, 373 U.S., at 724, 83 S.Ct. 1417, over four years elapsed between Enron's bankruptcy and Skilling's trial.  Although reporters covered Enron-related news throughout this period, the decibel level of media attention diminished somewhat in the years following Enron's collapse.  Finally, the Court considered the outcome of the trial, noting that the defendant had been acquitted on some of the counts against him.  The Court stated that "[i]t would be odd for an appellate court to presume prejudice in a case in which the juror's actions run counter to that presumption."  *Id.*  This last consideration is, of course, inapplicable to a pretrial motion for change of venue.

In *Murray v. Schriro*, 746 F.3d 418, 442 (9th Cir. 2014), the Ninth Circuit states that a court may presume prejudice only when the trial atmosphere is utterly corrupted by press coverage or when a waive of public passion makes a fair trial unlikely by the jury.  The court further stated that "[j]uror exposure to news reports of a crime–even 'pervasive, adverse publicity'–is not enough alone to trigger a presumption of prejudice to the defendant's due process rights."  *Id.*, citing *Skilling*, 130 S.Ct. at 2916.  "Rather, a presumption of prejudice 'attends only the extreme case.'"  *Id.*, citing *Skilling* at 2915.  The court found that adverse pretrial publicity attending the arrest and prosecution of two brothers for a murder committed in the Kingman, Arizona area did not support a finding of presumed prejudice.  The court noted that the bulk of the newspaper articles about the case were published months prior to trial, and not all of the articles were from the county in which the defendant was tried, or were even about the defendant.  The newspaper editorials submitted by the defendant concerned the death penalty, in general, and some questioned whether it was appropriate.  The court found that the vast majority of articles reported only facts, relaying what had occurred at trial on particular days.  The court also found that radio reports about the case were

brief and factual in nature.  746 F.3d at 444-45.

In *Hayes v. Ayers*, 632 F.3d 500 (9th Cir. 2011), the court found that pretrial publicity regarding the arrest and prosecution of the defendant for a double murder in Santa Cruz County, California did not rise to the level of presumed prejudice.  One local newspaper ran 37 articles about the case between February 1982 when the remains of the victims were found and early January 1983 when the defendant plead not guilty.  A second newspaper ran 30 articles about the case during the same period.  Other northern California newspapers and television and radio stations also covered the investigation and eventual criminal proceedings.  The court further noted that:

> The media coverage included descriptions of the victims' remains as they were found; Hayes's criminal history in Oregon and Minnesota, including the fact that he had been twice acquitted of murder (once because he was found not guilty by reason of insanity); Hayes commitment to and escape from a mental hospital; Garcia and Weller's descriptions of how Hayes shot MacVicar and de Laet and removed their heads and hands; and the fact that Weller passed a polygraph test.

632 F.3d at 507.

The defendant renewed and supplemented his motion for change of venue and documented additional press coverage during the next year, including articles "decrying the cost and inefficiency of the Hayes trial and that of another defendant . . . whose trial had recently been moved out of Santa Cruz County, and coverage of Hayes's jailhouse marriage to a former nun."  *Id.*  In denying Hayes's petition for habeas corpus relief, the court found that *Rideau* was "entirely distinguishable from what happened here."  *Id.*, 632 F.3d at 509.  The court stated that while the small size of Santa Cruz County (about 190,000 at the time of Hayes's motion) weighed in his favor, the press coverage "did not include 'the kind of vivid, unforgettable information' that viewers of Rideau's confession were exposed to. *Id.* at 2916."  The court stated that although the stories about Hayes were unflattering and in some instances included inadmissible evidence, "'they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight.' *Id.* at 2916.  No evidence of the smoking-gun variety invited prejudgment of his culpability.' *Id.*"  *Hayes*, 632 F.3d at 509.  The court further noted that

15

1  the publicity that Hayes complained about did not immediately precede his trial and therefore

2  lessened the potential for prejudice.

3       *Hayes* also relied on *Patton v. Yount*, 467 U.S. 1025, 1033, 104 S.Ct. 2885 (1984), in which

4  the Supreme Court rejected the defendant's assertion of presumed prejudice arising from pretrial

5  publicity.  The Ninth Circuit noted that in *Yount*, the press coverage reported not only the facts of

6  the crime, but also the defendant's prior confession, his prior plea of temporary insanity, and his

7  prior (overturned) conviction for the same murder.  The court further noted that the Supreme Court

8  did not  presume prejudice even though "all but 2 of 163 members of the venire panel for Yount's

9  trial who were questioned acknowledged that they had heard about the case and that 126 (77%)

10  admitted they would carry an opinion into the jury box based on pre-existing knowledge about the

11  case." *Id.* 632 F.3d at 509-510.

12       The Government also cites the decisions in *United States v. Tsarnaev*, 2014 WL 4823882

13  (D.Mass. 2014) (involving the 2013 Boston Marathon bombing) and *United States v. Salameh*,

14  1993 WL 364486 (S.D.N.Y. 1993) (involving the 1993 World Trade Center bombing), in which

15  the district courts denied defendants' motions to transfer venue based on presumed prejudice.

16  These cases are instructive in that even in cases which involve violent crimes and loss of life and

17  receive widespread media coverage, presumed prejudice against the defendants in the community

18  in which the crimes were allegedly committed is not easily established.

19       This case generated significant media coverage in the *Las Vegas Review-Journal* and on

20  local television new stations when the law enforcement investigation into the alleged scheme was

21  publicly disclosed in late 2008.  There was also significant newspaper and television coverage

22  between late 2010 and early 2012 relating to the alleged murder/suicide plot involving Nancy Quon

23  and regarding  the deaths of Ms. Quon and David Amesbury in March 2012.  During the same time

24  period, this case garnered significant media attention as other alleged participants in the scheme

25  were charged and entered guilty pleas.  Television news coverage, which has generally been brief

26  and factual in nature throughout the history of this case, diminished in 2013 and 2014.  So far in

27  2014, only five reports about the case have appeared on KLAS-CBS (Channel 8), with the last

28  report appearing on July 29, 2014.  These reports were on the guilty pleas of other individuals

16

1   involved in the alleged scheme or continuances/delays in the trial date.  *Defendant Benzer's Motion*

2   *(#391), Exhibit B.*  In 2013, there were only 10 days in which television reported on the case, all of

3   which occurred on or before June 25, 2013.  These reports included reports in May and June 2013

4   that Defendant Benzer had been separately charged for tax evasion.  Reports earlier in the year

5   discussed the filing of the indictment in this case.  *Id.*  This modest level of television news

6   coverage within the past two years undercuts the assertion of a trial atmosphere that is utterly

7   corrupted by press coverage or that this case has been subject to "pervasive, adverse publicity."

8          Defendants' motions are predicated primarily on the consistent and relatively frequent

9   reporting on this case by the *Las Vegas Review-Journal* that has continued throughout the case,

10  including 2013 and 2014.  It is also reasonable to expect that the newspaper will continue to report

11  on developments in this case up to and through trial.  Defendants have not established, however,

12  that the Court will be unable to empanel a fair and impartial jury because of their exposure to the

13  *Review-Journal's* coverage of the case.

14         First the Southern Nevada area from which the jury will be drawn has a population in

15  excess of 2 million people.  Of that number, there are approximately 1 million registered voters

16  from whom the jury will be selected.  A jury pool of this size mitigates the potential for prejudice.

17  *Skilling*, 130 S.Ct. at 2915.  The *Review-Journal* has a print circulation of approximately 167,000.

18  Even assuming the readership of the newspaper's website edition is equal to or in excess of that

19  number, it has not been established that a majority or significant percentage of the potential jurors

20  are regular or frequent readers of the *Review-Journal.*  The newspaper reports on many subjects of

21  public interest, including world, national and local news, as well as sports, entertainment and

22  business.  On the local Southern Nevada news front, there have been many other events, including

23  crimes and prosecutions, during the period this case has been pending that have presumably

24  attracted the public's attention. There is no evidence regarding what percentage of the *Review-*

25  *Journal's* readers have (1) read or viewed articles relating to this case or (2) have formed opinions

26  about this case based on those articles.

27         In *Skilling*, the Court noted that the defendant had commissioned a survey in conjunction

28  with his motion to change venue which showed that "only 12.3% of Houstonians named him when

17

1   asked to list Enron executives they believed guilty of crimes. . . .  In response to the follow-up

2   question '[w]hat words come to mind when you hear the name Jeff Skilling?', two-thirds of

3   respondents failed to say a singe negative word. . . .  43% either had never heard of Skilling or

4   stated that nothing came to mind when they heard his name, and another 23% knew Skilling's

5   name was associated with Enron but reported no opinion about him." 130 S.Ct. at 2915 n. 15.  The

6   polling data in *Skilling* is arguably revealing about the effect of extensive news media coverage in a

7   criminal case involving financial fraud.  The alleged fraud in Enron led to the collapse of a major

8   company and the case received widespread coverage in both national and local news media.

9   Notwithstanding that coverage, potential jurors in Houston, Texas where the criminal activity was

10  centered were unfamiliar with the defendant or had no opinion about him.

11      Although polling data is not conclusive, as *Skilling* indicates, it may provide relevant

12  information for a motion for change of venue.  In *United States v. Rodriguez*, 581 F.3d 775, 786

13  (8th Cir. 2009), the court noted that other circuits have declined to rely on public opinion polls

14  where the poll had methodological problems, *United States v. Campa*, 459 F. 3d 1121, 1145-46

15  (11th Cir. 2006); where the poll revealed only general public awareness of the crime, rather than

16  widespread belief about the defendant's guilt, *United States v. Malmay* 671 F.2d 869, 875-76 (5th

17  Cir. 1982); or where the court chose to disregard one side's private poll, given the adequacy of voir

18  dire procedures, *United States v. Haldeman*, 559 F.2d 31, 64 n. 43 (D.C. Cir. 1976).  *See also*

19  *United States Tsarnaev*, 2014 WL 4823882, *2 (D.Mass. 2014) and *Commonwealth v. Hernandez*,

20  2014 WL 6601958, *3-*5 (Mass.Super. 2014) (analyzing polling data submitted by defendants in

21  support of motions to transfer venue).  The Defendants in this case have not submitted any polling

22  data that would indicate either the level of public awareness of this case in Southern Nevada, or to

23  what extent the public has formed opinions about Defendants' alleged guilt.  Because the great

24  majority of the news coverage has emanated from a single newspaper with a limited circulation in

25  the community, the absence of such polling information is at least noteworthy.

26      Defendant Gregory has pointed to the inflammatory online comments by readers of the

27  *Review-Journal* articles since March 2013, either as evidence of the prejudice against Defendants

28  or as contributing to the atmosphere of prejudice.  In *United States v. Philpot*, 733 F.3d 734, 741

(7th Cir. 2013), the Seventh Circuit dismissed the defendant's argument that the online comments

to the newspaper articles prejudiced his ability to obtain a fair trial, stating that "few readers would

take the comments section of an online news story to be anything but mostly-anonymous opinions."

In analyzing the online comments, the district court in *Philpot* noted that the comments ranged

from as few as four comments per article to as many as 62 comments.  The district court stated that:

> [T]hese online comments are the personal opinions of the anonymous
> commenting readers and not of the newspaper staff or guest writers.
> The online comments are contained in a separate section of the
> webpage following the article, such that it is clear the comments are
> not an extension of the article and are not being made by the author
> or other newspaper staff.  The comments do not purport to be fact-
> based.  These comments are not included in the traditional print
> versions of the newspapers.  Philpot offers no data to show what
> percentage of newspaper readers, or potential jurors, read the print
> versus the online versions of the articles, what percentage of those
> who read the online versions also read the comments, or what
> readers' attitudes are of the online commentary written by other
> readers.

*United States v. Philpot*, 2012 WL 2064620, *3 (N.D.Ind. 2012).

The *Philpot* court's statements about the online comments in that case are applicable to the

readers' comments appearing in the *Review-Journal's* online version.  The *Review-Journal* also

includes the following disclaimer above the comments section to each online article: "Comments

posted below are from readers.  In no way do they represent the view of Stephens Media LLC or

this newspaper.  This is a public forum.  Read our guidelines for posting.  If you believe that a

commentator has not followed these guidelines, please click the FLAG icon next to the comment."

*Defendant Gregory's Motion (#383), Exhibit RR.*  For the reasons discussed in the *Philpot*

decisions, this Court also rejects Defendant's argument that the reader comments in the online

edition of the *Review-Journal* demonstrate the existence of significant community prejudice against

Defendants.  As in *Philpot*, Defendants have not provided any data to demonstrate any significant

prejudice resulting from these online comments.

The television news coverage of this case has generally been factual in nature and not

inflammatory.  The *Review-Journal* articles have also usually been factual in nature.  The articles

have frequently referred to Defendant Benzer as the alleged mastermind of the conspiracy or a

central figure in the conspiracy.  The indictment itself alleges that Defendant Benzer was a

mastermind of the conspiracy. *Indictment (#1)*, ¶ 12. Those characterizations are no more prejudicial than news articles which discuss a horrible murder and refer to the defendant as the alleged perpetrator. *See Patton v. Yount* and *Hayes v. Ayers, supra.* Articles regarding the numerous individuals who have already entered guilty pleas to the alleged conspiracy are also a potential source of prejudice. Most of the pleas and related articles occurred over a year ago, however, and their prejudicial effect will likely be dissipated by the time of trial. The *Review-Journal* editorial that commented on the alleged conspiracy, itself, appeared in March 2011, and was directed at the need for tort reform rather than at commenting on the alleged guilt of individual defendants. That editorial will have been nearly 4 years in the past by the time this case proceeds to trial and is therefore unlikely to have influenced the prospective jurors. More recent editorials have been directed at the government, the court and/or the attorneys involved in the case and the alleged unnecessary secrecy of proceedings in this case.

The newspaper article that raises the most serious concern for potential prejudice is the October 30, 2014 article regarding the reports on Defendant Benzer's proffer sessions with the Government. Individuals who read the article about Mr. Benzer's alleged statements to the government may be impaired in their ability to be fair and impartial jurors. Unlike *Rideau*, however, where the defendant's filmed confession was repeatedly televised in a small community during the brief period before trial, the report on Defendant Benzer's proffer sessions has so far appeared in one newspaper article. Trial in this case will not begin until nearly four months after the article appeared and it is reasonably possible, if not likely, that the effect of this article will be diminished by that time. Again, it is unknown how many prospective jurors will have actually read this article or other newspaper accounts about the case. It appears that prospective jurors who have formed opinions about this case based on their exposure to news media coverage can be identified through the voir dire process adopted by the Court, and that through the exercise of challenges for cause and preemptory challenges, a fair and impartial jury can be seated.[4]

---

[4] Of course, if the prospective jurors' responses to written questionnaires or during voir dire demonstrate a much higher level of prejudice resulting from pretrial publicity than appears likely at this time, then the Court has the ability to revisit this issue and order a change of venue if necessary.

Defendants also argue that because a substantial percentage of the population of Southern Nevada lives in communities governed by homeowners associations, they cannot receive a fair and impartial trial in Las Vegas.  The Court recognizes that homeowners association boards and board members are sometimes, if not often, the subjects of controversy.  The Court is also aware that there has been a substantial amount of construction defect litigation involving residential developments in Southern Nevada over the past decade or more.  Jurors who reside in such communities may identity with or have sympathy for the alleged victims in this case.  That does not mean, however, that they will be unable to set aside sympathy or their own experiences and decide this case fairly and impartially based on the evidence presented at trial.  Defendant's reliance on newspaper interviews with residents of homeowners associations or online comments by such residents fail to demonstrate that the Las Vegas community has become so impassioned or inflamed about alleged frauds perpetrated by or against homeowners associations, that a fair trial involving such matters cannot be had in Las Vegas.

## **CONCLUSION**

Although the news media coverage of this case, particularly in the *Las Vegas Review-Journal,* has been extensive and continuous, that coverage has not been of such a nature or scope as support a finding that the trial atmosphere for this case has been utterly corrupted and that it is impossible to impanel a fair and impartial jury for Defendants' trial.  Accordingly,

**IT IS HEREBY ORDERED** that Defendant Keith Gregory's Motion to Change Venue (#383), Defendant Edith Gillespie's Motion for Joinder to Gregory's Motion for Change of Venue (#385) and Defendant Leon Benzer's Motion for Transfer of Trial to the Unofficial Northern Division of the District Court of Nevada (#391) are **denied**.

DATED this 24th day of December, 2014.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge

21